IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 05, 2015


**STATE OF TENNESSEE v. ROBERT TOWNSEND**

**Appeal from the Criminal Court for Shelby County**
**No. 12-04688     James C. Beasley, Jr., Judge**

_____

**No. W2014-00992-CCA-R3-CD  -  Filed August 25, 2015**

_____


A Shelby County jury found the Defendant, Robert Townsend, guilty of first degree premeditated murder.  On appeal, the Defendant challenges the sufficiency of the evidence against him.  After a thorough review of the record and the applicable law, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, delivered the opinion of the Court, in which NORMA MCGEE OGLE and ROGER A. PAGE, JJ., joined.

Claiborne H. Ferguson, Memphis, Tennessee, for the appellant, Robert Townsend.

Herbert H. Slatery III, Attorney General and Reporter; Tracy L. Alcock, Assistant Attorney General; Amy P. Weirich, District Attorney General; Alanda H. Dwyer and Pamela Starl, Assistant District Attorneys General, for the appellee, State of Tennessee.


**OPINION**

This case arises from a shooting at Eastwood Park Apartments in Shelby County, Tennessee, on August 9, 2012.  A Shelby County grand jury indicted the Defendant for the first degree premeditated murder of nineteen-year-old Markeith Bohannon.  At a trial on the charged offense, the parties presented the following evidence:  James Rudd, a Memphis Police Department officer, testified that, on the morning of August 9, 2012, he responded to a shots-fired call at the Eastwood Park Apartments.  When he arrived, he

observed twelve to thirteen bystanders gathered in the breezeway between the apartment buildings. He approached the crowd and discovered a young black man who was deceased lying on the ground. Officer Rudd recalled that he notified dispatch and requested back-up. After speaking with witnesses, the police developed a description of the suspect. The shooter was a black male who wore his hair in dreadlocks. He was accompanied by a black female who was driving a white Chevrolet Impala.

James Hogan testified that he worked for Flagship Security Company and that, in August 2012, he was assigned to the Kensington Manor Apartments on Getwell Road, just north of the Eastwood Park Apartments. Mr. Hogan recalled that at around 7:00 a.m. on August 9, 2012, he observed a white Chevrolet Impala enter the Kensington Manor property at a "pretty fast" rate of speed. Mr. Hogan knew the Impala did not belong to one of the residents, so he intended to approach the car. As he looked in his rear view mirror, he saw the car turn around and proceed back toward Getwell Road. The Impala stopped approximately fifty feet in front of Mr. Hogan, and he observed that the license tags on the Impala were Louisiana tags.

Mr. Hogan testified that he observed a black male exit the driver's seat of the Impala and walk around toward the passenger side. At the same time, a black female exited the passenger side and walked around the rear of the vehicle. The male wore red plaid shorts, a tan shirt, was of medium build, and wore his hair in dreadlocks. Mr. Hogan described the female as having worn yellow "Daisy Duke shorts and overalls" with fishnet stockings and a blonde ponytail. The man and woman stopped at the trunk of the Impala and engaged in a conversation. Mr. Hogan said that, based on the female's mannerisms, he had the impression that she did not want to get in the driver's seat. After a few seconds she got into the driver's seat, and they drove off the property on to Getwell Road.

Mr. Hogan testified that "a couple of minutes" later, he heard two or three gunshots. The gunshots sounded close enough to have been in Kensington Manor Apartments; however, upon checking the area, he found no one. Shortly thereafter, a Memphis Police Department officer patrolling the area informed him there had been a shooting at the Eastwood Park Apartments located next to Kensington Manor Apartments. Mr. Hogan shared with the officer his observations of the Impala.

Branda Turner, a resident of Eastwood Park Apartments, testified that around 7:00 a.m. on August 9, 2012, she was sitting on her back porch with her sister. She heard what she thought was a firecracker, but her sister said the sound was gun fire. Ms. Turner turned to see a "young man" running with another man in pursuit, shooting a gun. Ms. Turner described the "young man" being chased as "[a] young black male, [who] had on some jogging pants and a dark shirt." She said, "[h]e looked like a kid to me, low cut

2

haircut." She said the man chasing the "young man" was a "slim black male" who had dreadlocks and who was wearing plaid pants and a bright-colored shirt.

Ms. Turner testified that she ran inside her home, describing herself as "in a panic." Ms. Turner had watched the shooter chase the young man into a nearby alley. When she looked out the storm door of her home, she saw the shooter walk out of the same alley as he put the gun inside his pants pocket. Ms. Turner stated that she was unable to clearly see the shooter's face because his hair was so long. Ms. Turner estimated that she heard four gunshots.

Monique Frazier testified that, in August 2012, she lived at the Eastwood Park Apartments. She woke up to the sound of gunshots on the morning of August 9, 2012, at around 7:00 a.m. Ms. Frazier got up and immediately looked out her window that faced the parking lot. She saw a man holding a black revolver, pacing back and forth in the parking lot while "hollering" on a cell phone. She described this man as "thin frame, dark man, long neat dreds, very long nice dreds," and wearing plaid shorts. The man put the gun in his back pocket as he continued to talk on the phone. Ms. Frazier observed children walking past the man with the gun in the parking lot on their way to school.

Ms. Frazier testified that she was concerned for the safety of the children, so she stepped out on to her balcony and called to the children to come to her. While out on the balcony, she heard the man yell into the telephone, "[B]itch, where you at?" The man walked to the back of the apartments and then a white Impala, driven by a woman, drove to the same area. Ms. Frazier estimated that it was "less than a minute" later when the white Impala sped out of the apartment complex.

Kendrich Naylor testified that, in August 2012, his friend, Katrina Malone, rented a white Chevrolet Impala for him. He recalled that the rented Impala had a Louisiana license tag. Early on the morning of August 9, 2012, the Defendant, a friend of Mr. Naylor, asked to borrow the Impala, and Mr. Naylor agreed. The Defendant took the Impala and returned fifteen or twenty minutes later with his girlfriend. He stated that neither the Defendant nor the Defendant's girlfriend acted unusual. Mr. Naylor then drove the Defendant and his girlfriend to the Defendant's car, a silver BMW, parked on Winchester Road. It was not until several hours later that Mr. Naylor learned of the shooting at the Eastwood Park Apartments.

Mr. Naylor testified that on the afternoon of August 9, 2012, he and a friend were driving around the Eastwood Park Apartments, and he noticed people looking at them and writing down the license plate for the Impala. Mr. Naylor dropped off his friend and then drove back to 61 Hotel where he was staying. Two days later the police came to the hotel and questioned him about the shooting. Mr. Naylor told the police that he did not

3

have any involvement in the homicide and explained that he had loaned the Impala to the Defendant.

On cross-examination, Mr. Naylor agreed that he had told the police that, when the Defendant returned the Impala, he thought the Defendant and his girlfriend may have been in an argument but that when Mr. Naylor asked the Defendant about it, the Defendant did not respond.

Mr. Naylor agreed that the Defendant asked Mr. Naylor to drive him to a location to meet his girlfriend after receiving a telephone call. Mr. Naylor said that he was "smoking weed at the time," so he allowed the Defendant to borrow the Impala. Mr. Naylor denied that the Defendant acted or looked mad when he left despite having told the police that the Defendant was mad.

Jerry Brown testified that, on the morning of August 9, 2012, he was standing in the Eastwood Park Apartment complex parking lot talking with a mechanic about work needed on his truck. As he was standing there, a woman driving a white Chevrolet Impala bearing a Louisiana license plate pulled up and a man, later identified as the Defendant, got out of the car. The Defendant walked "out the apartments, came back in, saw this other guy and chased him and started shooting at him." Mr. Brown described the shooter as approximately six feet tall with a dark complexion and dreadlocks. Mr. Brown got inside his truck and "pulled on around to the next drive." He observed the Defendant walk back to where the victim was lying on the ground and then leave the apartment complex. Mr. Brown later spoke with the police and identified the Defendant from a photographic line-up as the shooter.

On cross-examination, Mr. Brown stated that he observed the Defendant fire two shots and heard an additional two shots after the Defendant had entered the alley or breezeway. After the Defendant walked back out of the alley and to the parking lot, he began talking on his cell phone. Mr. Townsend observed the Impala return to the parking lot.

Mark Miller, a Memphis Police Department officer, testified that he was involved in the investigation of the shooting death of the victim. After unsuccessful attempts to locate the Defendant in Shelby County, a warrant was issued for his arrest. Approximately a month after the shooting, the Defendant was arrested in Florida and transported to Tennessee.

Marco Ross, Deputy Chief Medical Examiner for Shelby County, testified as an expert witness in the field of forensic pathology. Dr. Ross performed the autopsy on the victim. The external examination of the body revealed a gunshot wound to his chest,

with the entrance wound to the left mid-back area and the exit wound through the right upper chest area. Also present were abrasions to the victim's left cheek, a laceration on his chin, and scrape marks on the left front part of his chest and left little finger. The internal examination revealed that the bullet traveled through the victim's left lung, through the heart, two major blood vessels, and then through the upper part of his right lung causing "massive internal bleeding." Considering the nature of the injury and amount of blood present, Dr. Ross opined that the victim likely did not live "more than several minutes" after being shot. The toxicology report revealed the presence of "a fairly low amount" of marijuana products in the victim's system. Dr. Ross stated that the cause of death was a gunshot wound to the chest and that the manner of death was a homicide.

The defense called Ashia King-Bishop who testified that the Defendant was her boyfriend and the father of her two-year-old child. In August 2012, Ms. King-Bishop lived with the Defendant and worked as a prostitute to provide for her children. Ms. King-Bishop denied that the Defendant was her "pimp" but stated that she "[o]ften" gave him her earnings. Early on the morning of August 9, 2012, Ms. King-Bishop was working when the victim, who wore a black t-shirt and black shorts, approached her offering a hundred dollars. She told the victim she was not interested because the victim was "too young for [her] to date."

Ms. King-Bishop testified that the victim persisted and became angry when Ms. King-Bishop would not agree to "date." The victim pushed Ms. King-Bishop into a wooded area where he repeatedly hit her. The victim got on top of Ms. King-Bishop, held her down and began unfastening his pants. Ms. King-Bishop stated that she was "terrified," and the victim struck her in the face three times, "bust[ing] [her] nose and blood vessel in [her] eye." She said that the victim would not have had to undress her in order to rape her based upon the clothing she wore at the time. Before the victim could force himself on her, Ms. King-Bishop kneed him in the groin, causing the victim to fall away from her. Ms. King-Bishop used this opportunity to flee. Ms. King-Bishop said that this incident occurred on Knight Arnold Road and she ran toward the cross streets of Knight Arnold Road and Lamar Avenue while trying to contact the Defendant on her cell phone.

Ms. King-Bishop testified that she told the Defendant that she had been attacked and that the Defendant met her at a convenience store "off Knight Arnold." The Defendant drove Mr. Naylor's white Impala to meet her. Ms. King-Bishop described the Defendant as "distraught" and "upset" when he saw her swollen eye and bloody nose. She told him that the victim had tried to rape her. She denied that either she or the Defendant knew or had ever had contact with the victim before this incident.

5

Ms. King-Bishop testified that they left the convenience store, and the Defendant drove on Knight Arnold Road back towards Getwell Road where the incident had occurred. She described the Defendant as "furious." When they neared the area of the incident, Ms. King-Bishop saw the victim and pointed him out to the Defendant. The Defendant turned the Impala around and drove back to where she had seen the victim. The Defendant saw the victim in an apartment complex, got out of the Impala, and told Ms. King-Bishop to leave. As Ms. King-Bishop drove onto Getwell Road, she heard gunshots. Ms. King-Bishop said that she immediately turned around and went back to the apartment complex to look for the Defendant. When she did not find him, she left the complex again headed towards Getwell Road and Knight Arnold Road. As she drove, she saw the Defendant walking down Knight Arnold Road, so she stopped, picked him up, and they drove home.

Ms. King-Bishop testified that she never called the police about the victim's assault of her. She said that she had given the gun to the Defendant two days before the shooting after stealing it from her "john." Several days after the shooting, the Defendant asked Ms. King-Bishop if she wanted to take a trip, and the two went to Chattanooga, Tennessee, and then Florida. While in Florida, Ms. King-Bishop and the Defendant were approached and arrested by the U.S. Marshals Service. She was later released, but the Defendant remained in custody.

On cross-examination, Ms. King-Bishop agreed that the Defendant was aware that she worked as a prostitute and confirmed that the Defendant was not working during this time. Ms. King-Bishop recalled that, in the hours before the shooting, one of her "johns" had picked her up from the hotel where she and the Defendant were staying. The two drove to a secluded location and then after the "date" she left the area on foot. Her next "date" picked her up on the street, and the two returned to the same secluded area for approximately twenty minutes. Ms. King-Bishop once again left the secluded area on foot walking down Goodlett Street toward Knight Arnold Road where she encountered the victim. Ms. King-Bishop reiterated that she had never seen the victim before. She estimated that it was about 7:00 a.m. at this point, and although generally a high traffic time, there was not much traffic on Knight Arnold Road that day. Ms. King-Bishop confirmed that she crossed the four lanes on Knight Arnold Road twice to try and avoid the victim before coming in contact with the victim who attempted to arrange a "date."

Ms. King-Bishop testified that she was wearing a blue dress rather than a yellow shorts outfit with fishnet hose when the victim approached her. She further denied wearing a blonde ponytail. The victim offered Ms. King-Bishop $100, and she declined because she preferred "older men." The victim then pushed Ms. King-Bishop into a wooded area where she sustained a broken blood vessel to her eye and a "busted" nose as a result of the attack. Ms. King-Bishop stated that, after getting away from the victim,

6

she began walking down the street and the victim followed her. She began running while repeatedly attempting to reach the Defendant, who did not initially answer her calls, on her cell phone. Ms. King-Bishop stated that she did not attempt to flag down a car or seek help from a nearby convenience store when the victim was chasing her after the assault. Instead, Ms. King-Bishop ran into an alleyway near the convenience store where she was finally able to make contact with the Defendant who agreed to come and pick her up.

Ms. King-Bishop first denied returning the Impala to Mr. Naylor and then agreed that she went with the Defendant to return the Impala. Ms. King-Bishop also denied that the Defendant drove into Kensington Manor Apartments before driving to Eastwood Park Apartments. She stated that, after picking her up, the Defendant drove to Eastwood Park Apartment complex, and he sat in the car consoling Ms. King-Bishop for about five minutes before they saw the victim walking through the apartment complex. Ms. King-Bishop clarified that she had seen the victim while driving down Knight Arnold Road as she had testified on direct examination but that she did not point him out to the Defendant until they were in the apartment complex. Ms. King-Bishop agreed that a medical complex was directly across from the Eastwood Park Apartment complex but that rather than seek medical treatment for her injuries, they drove into the apartment complex and sat.

Ms. King-Bishop testified about the events following the shooting. Mr. Naylor drove the couple to the Defendant's car, and then she and the Defendant drove to "Peach's" house to get her children. The couple then drove to Ms. King-Bishop's mother's house where she left her children with her mother. When she returned to the car after leaving the children with her mother, the Defendant suggested they drive to Chattanooga. The couple stayed in Chattanooga for three weeks, even though her mother believed Ms. King-Bishop would return for her children the following day. Ms. King-Bishop agreed that the police began looking for the Defendant in Chattanooga, so she and the Defendant drove to Florida in the Defendant's BMW.

Ms. King-Bishop agreed that she initially told prosecutors that, on August 9, 2012, she had been at New York, New York Club seeking employment as a dancer. She did not recall telling prosecutors that she left the New York, New York Club at approximately 6:30 a.m. and walked down Getwell to "Brittany's" house on Murphy Street in order for Brittany to drive her back to her hotel room. Ms. King-Bishop denied that this was possible because she "was working" that night. Ms. King-Bishop stated that she did not recall altering this initial statement during her second meeting with prosecutors by claiming that she was working in the parking lot of the club that night rather than inside seeking employment as she had stated during the first meeting.

7

Ms. King-Bishop testified that neither she nor the Defendant knew the victim and that the victim would have no reason to have recognized the Defendant or the white Impala at the Eastwood Park Apartments.

The Defendant testified that he had two prior aggravated robbery convictions from 1999 and 2004. He served jail time for those convictions and was most recently released from jail in 2009. The Defendant stated that he was in a relationship with Ms. King-Bishop with whom he shared a child, who was five months old at the time of the shooting. He acknowledged that Ms. King-Bishop worked as a prostitute and that he was unemployed at the time of these events.

The Defendant testified about the events leading up to the shooting. On August 9, 2012, at around 7:00 a.m., the Defendant was with friends at a tire shop. While the men waited for a car tire to be repaired, they "chill[ed], smok[ed] weed, [and] dr[a]nk[ ]." As the Defendant stood outside the tire shop, he heard Ms. King-Bishop, who was in the alleyway by the convenience store, call his name and ask why he was not answering his phone. The Defendant retrieved his cell phone from the car and called Ms. King-Bishop, who told him about the attack. The Defendant borrowed Mr. Naylor's car and drove to where Ms. King-Bishop was waiting for him. Ms. King-Bishop, whose nose was bleeding and her face swollen from injury, told the Defendant that the victim became "mad and aggressive" when she declined his request for a "date" and attempted to rape her "two or three different times."

The Defendant testified that, upon learning of the attack, he became "upset" and felt "angry." The Defendant drove the Impala onto Knight Arnold Road toward the area where the assault had occurred in an attempt to find the victim. Ms. King-Bishop pointed out the victim, who was walking on Knight Arnold Road. The Defendant drove down Getwell Road and turned in to an apartment complex to change seats with Ms. King-Bishop. He explained that he did this so that he could get out of the car to "confront" the victim. Ms. King-Bishop drove the Impala to the Eastwood Park Apartments. The Defendant exited the Impala and instructed Ms. King-Bishop to leave. The Defendant saw the victim walking into the apartment complex. As Ms. King-Bishop drove out of the complex, the Defendant watched the victim observe her leaving and "put two and two together" before the victim began running away from the Defendant.

The Defendant testified that he began chasing the victim. During the chase, the Defendant took out his gun and fired at the victim twice. The victim jumped over a gate and turned a corner running out of the Defendant's line of sight. At this point the Defendant did not know whether or not he had hit the victim. The Defendant exited the complex and began walking down Knight Arnold Road where Ms. King-Bishop picked him up. The Defendant denied that he was trying to kill the victim when he fired his gun,

explaining that he fired his gun because he knew he was not "going to catch [the victim]." He said that he hoped the gunfire would scare the victim into stopping. The Defendant described his mental state during the chase as "upset," "scared," and "terrified," explaining that he had "just did all this time before in jail so [he] really didn't want to go back." The Defendant added that before the victim began running, the victim said, "I didn't do anything," which caused the Defendant to become even angrier.

The Defendant testified that he did not call the police about the victim's attack on Ms. King-Bishop because "they don't do nothing." The Defendant said that he did not learn of the victim's death until "Breaking news" later that same day. Two or three days after the shooting, the Defendant's mother also called to inform him that the police were looking for him for questioning. Based upon this information, the Defendant did not rent any more hotel rooms and instead stayed with a friend for a "couple of days" before leaving Memphis. The Defendant stated that he threw the gun into the Mississippi River.

On cross-examination, the Defendant agreed that Ms. King-Bishop had been attacked before while at work. He agreed that "[t]hat kind of stuff happens to a girl that's working on Lamar." The Defendant agreed that he had not killed the other people who had attacked Ms. King-Bishop while she worked. The Defendant said that he was "driving normal" and "not rushing" when he went to pick up Ms. King-Bishop. The Defendant explained that he was "driving normal" because he was intoxicated and illegally carrying a weapon. The Defendant said that he kept the gun that Ms. King-Bishop gave him because he "wanted it." The Defendant stated that he was "provoked to shoot the [victim]." When asked to clarify this answer in light of the fact that the victim was fleeing from the Defendant at the time of the shooting, the Defendant stated that the provocation was the victim "attacking [his] baby momma."

The Defendant testified that he asked Ms. King-Bishop to drive the Impala because he did not want the victim to see her. He agreed that "most people" look at the driver of a car before they look at a passenger but maintained that he asked her to drive so she would not be seen. The Defendant agreed that when he decided to confront the victim he knew he had a gun in his pocket and that it was not legal for him to possess that gun, but it never occurred to him that he could shoot the victim. The Defendant agreed that he had robbed people at gunpoint before and, although he knew he could shoot someone with a gun, he maintained that he never thought about his ability to shoot and kill the victim. The Defendant stated that he did not fire his gun until he saw that the victim was about to get away by jumping the gate. After shooting the victim, the Defendant "ditched the gun outside the apartments."

Based upon this evidence, the jury convicted the Defendant of first degree premeditated murder. It is from this judgment that the Defendant appeals.

## II. Analysis

The Defendant asserts that the evidence is insufficient to sustain his conviction for first degree premeditated murder. He argues that the proof supported a conviction for voluntary manslaughter because there was insufficient proof that he acted with premeditation. The State responds that the evidence is sufficient to support the Defendant's conviction. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978), superseded by statute on other grounds as stated in *State v. Barone*, 852 S.W.2d 216, 218 (Tenn.1993)) (quotations omitted). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

First degree premeditated murder is defined as a "premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1) (2010). Premeditation refers to "an act done after the exercise of reflection and judgment." T.C.A. § 39-13-202(d) (2010). Whether the defendant premeditated the killing is for the jury to decide, and the jury may look at the circumstances of the killing to decide that issue. *Bland*, 958 S.W.2d at 660. The Tennessee Code states that, while "the intent to kill must have been formed prior to the act itself," that purpose need not "preexist in the mind of the accused for any definite period of time" for a defendant to have premeditated the killing. T.C.A. § 39-13-202(d) (2010).

The following factors have been accepted as actions that demonstrate the existence of premeditation: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. *Bland*, 958 S.W.2d at 660. In addition, a jury may consider destruction or secretion of evidence of the murder and "the planning activities by the [defendant] prior to the killing, the [defendant]'s prior relationship with the victim, and the nature of the killing." *State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000); *State v. Halake*, 102 S.W.3d 661, 668 (Tenn. Crim. App. 2001) (citing *State v. Gentry*, 881 S.W.2d 1, 4-5 (Tenn. Crim. App. 1993)). Also, "[e]stablishment of a motive for the killing is a factor from which the jury may infer premeditation." *State v. Leach*, 148 S.W.3d 42, 54 (Tenn. 2004).

11

The evidence, considered in the light most favorable to the State, proves that the Defendant, armed with a weapon Ms. King-Bishop had stolen two days before and driving a borrowed rental car from Mr. Naylor, went to "confront" the victim. After seeing the victim walking on the street, the Defendant pulled into a nearby apartment complex, Kensington Manor Apartments, and ordered Ms. King-Bishop to drive the borrowed Impala to allow him to "confront" the victim. Ms. King-Bishop then drove to another apartment complex, Eastwood Park Apartments, where the Defendant suspected the victim would be found. The Defendant then instructed Ms. King-Bishop to leave. Upon seeing the Defendant, the victim fled. The Defendant chased the victim through the complex while firing a gun at the victim. As the victim attempted to escape over a fence, the Defendant shot the victim in the back, killing him. The Defendant then walked away from the dying victim and returned to the parking lot where Ms. King-Bishop drove him away from the complex. At some point following the shooting, the Defendant disposed of the gun he used to kill the victim. The couple returned the borrowed car to Mr. Naylor, took the children to Ms. King-Bishop's mother's home, and then left Memphis. The couple stayed in Chattanooga for three weeks until the police began to look for them there and then fled to Florida where they were ultimately apprehended.

We conclude that the State's evidence is sufficient to support the jury's finding that the Defendant killed the victim with premeditation. The Defendant obtained a weapon shortly before the shooting, took it with him to "confront" the unarmed victim, and the Defendant shot the victim in the back as the victim attempted to flee. The Defendant then walked out of the alleyway to the parking lot and Ms. King-Bishop drove him away from the crime scene. The Defendant disposed of the weapon and the couple left Memphis for Chattanooga and then Florida. Accordingly, we conclude that the evidence is sufficient to support the Defendant's conviction for the first degree premeditated murder of the victim. The Defendant is not entitled to relief.

### III. Conclusion

After a thorough review of the record and the applicable law, we conclude that the record contains sufficient evidence to support the Defendant's conviction for first degree premeditated murder. Accordingly, we affirm the judgment of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE

12